1

2

3

4

5          UNITED STATES DISTRICT COURT

6          EASTERN DISTRICT OF WASHINGTON

7

8   MARY WILMOTH o/b/o J.W.,          )   No. CV-06-3072-AAM
    a minor child,                     )
9                                      )   **ORDER GRANTING**
                                       )   **DEFENDANT'S MOTION**
10                                     )   **FOR SUMMARY JUDGMENT,**
                Plaintiff,             )   *INTER ALIA*
11                                     )
       vs.                            )
12                                     )
                                       )
13  MICHAEL J. ASTRUE,                 )
    Commissioner of Social             )
14  Security,                          )
                                       )
15                                     )
                                       )
16                                     )
                Defendant.             )
17  _____   )

18       **BEFORE THE COURT** are plaintiff's motion for summary

19  judgment (Ct. Rec. 19) and the defendant's motion for summary judgment

20  (Ct. Rec. 22).

21

22                        **JURISDICTION**

23       On January 13, 2003, Mary Wilmoth protectively applied for

24  Supplemental Security Income benefits ("SSI") on behalf of her minor child,

25  J.W., referred to herein as "plaintiff."  The application was denied initially

26  and on reconsideration.  After timely requesting a hearing, plaintiff, J.W.,

27  represented by counsel, appeared and testified before Administrative Law

28  **ORDER GRANTING DEFENDANT'S**
    **MOTION FOR SUMMARY JUDGMENT-** 1

Judge ("ALJ") Mary Reed on May 25, 2005.  Thomas McKnight, Ph.D., testified as a medical advisor/expert.  On October 27, 2005, the ALJ issued a decision denying benefits.  The Appeals Council denied a request for review and the ALJ's decision became the final decision of the Commissioner.  This decision is appealable to district court pursuant to 42 U.S.C. § 405(g).

## STATEMENT OF FACTS

The facts have been presented in the administrative transcript, the ALJ's decision, the plaintiff's and defendant's briefs and will only be summarized here.  At the time of the hearing, plaintiff was 10 years old and attending grade school.  Plaintiff alleges disability due to attention deficit hyperactivity disorder (ADHD) and dysthymia.

## STANDARD OF REVIEW

"The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence, 42 U.S.C. § 405(g)...."  *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983).  Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance.  *McAllister v. Sullivan*, 888 F.2d 599, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld.  *Beane v. Richardson*, 457 F.2d 758, 759 (9th Cir. 1972); *Mark v. Celebrezze*, 348

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-** 2

1    F.2d 289, 293 (9th Cir. 1965).  On review, the court considers the record as

2    a whole, not just the evidence supporting the decision of the Commissioner.

3    *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989), quoting *Kornock v.*

4    *Harris*, 648 F.2d 525, 526 (9th Cir. 1980); *Thompson v. Schweiker*, 665

5    F.2d 936, 939 (9th Cir. 1982).

6        It is the role of the trier of fact, not this court to resolve conflicts in

7    evidence.  *Richardson*, 402 U.S. at 400.  If evidence supports more than one

8    rational interpretation, the court must uphold the decision of the ALJ.  *Allen*

9    *v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

10        A decision supported by substantial evidence will still be set aside if

11    the proper legal standards were not applied in weighing the evidence and

12    making the decision.  *Brawner v. Secretary of Health and Human Services*,

13    839 F.2d 432, 433 (9th Cir. 1987).

14

15                                    **ISSUES**

16    Plaintiff argues the ALJ erred in determining that plaintiff's combination

17    of impairments does not functionally equal an impairment set forth in the

18    Listing of Impairments.

19

20                                  **DISCUSSION**

21    **SEQUENTIAL EVALUATION PROCESS**

22    An individual under the age of 18 is considered disabled if he "has a

23    medically determinable physical or mental impairment, which results in

24    marked and severe functional limitations, and which can be expected to

25    result in death or which has lasted or can be expected to last for a continuous

26    period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

27        The Commissioner has established a three-step sequential evaluation

28
**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 3**

process for determining whether a child is disabled.  20 C.F.R. §416.924.
Step one determines if the child is engaged in substantial gainful activities.
If he is, benefits are denied.  20 C.F.R. §416.924(b). If he is not, the
decision-maker proceeds to step two, which determines whether the child has
a medically severe impairment or combination of impairments.  20 C.F.R.
§416.924(c).  If the claimant does not have a severe impairment or
combination of impairments, the disability claim is denied.  If the
impairment is severe, the evaluation proceeds to the third step, which
requires the child's impairment to meet, medically equal, or functionally
equal an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1.[1]  20
C.F.R. §416.924(d).  If the impairment meets or equals one of the listed
impairments, the child is conclusively presumed to be disabled.

**ALJ'S FINDINGS**

The ALJ found plaintiff had not engaged in substantial gainful activity
and had severe medically determinable impairments, those being attention
deficit hyperactivity disorder (ADHD) and dysthymia.  The ALJ found,
however, that these impairments do not meet or medically equal any of the
listed impairments.  Furthermore, the ALJ found plaintiff does not have an
"extreme" limitation in any domain of functioning, does not have a "marked"
limitation in two domains of functioning, and therefore, does not have
impairments which functionally equal a listed impairment.  Accordingly, the
ALJ concluded the plaintiff is not disabled.

//

---

[1] Part B provides the medical criteria for the evaluation of impairments of children under the age of 18.

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-** 4

1  **FUNCTIONAL EQUIVALENCE**

2      An impairment functionally equals the listings if it is of listing-level

3  severity.  An impairment is of listing-level severity if it results in "marked"

4  limitations in two domains of functioning or an "extreme" limitation in one

5  domain.  20 C.F.R.§416.926a(a).  Six "domains" are considered, including:

6  (1) Acquiring And Using Information; (2) Attending And Completing Tasks;

7  (3) Interacting And Relating With Others; (4) Moving About And

8  Manipulating Objects; (5) Caring For Yourself; and (6) Health And Physical

9  Well-Being.  20 C.F.R. Section 416.926a(b)(1).

10      A "marked" limitation exists when impairments "seriously" interfere

11  with the ability to independently initiate, sustain, or complete activities.

12  Day-to-day functioning may be seriously limited when impairments limit

13  only one activity or when the interactive and cumulative effects of

14  impairments limit several activities.  A "marked" limitation is "more than

15  moderate," but "less than extreme" and is the equivalent of functioning

16  expected to be found on standardized testing with scores that are at least two,

17  but less than three, standard deviations below the mean.  20 C.F.R.

18  §416.926a(e)(2).

19      An "extreme" limitation exists when impairments "very seriously"

20  interfere with the ability to independently initiate, sustain, or complete

21  activities.  Day-to-day functioning may be very seriously limited when

22  impairments limit only one activity or when the interactive and cumulative

23  effects of impairments limit several activities.   "Extreme" limitation is the

24  rating given to the worst limitations, although it does not necessarily mean a

25  total lack or loss of ability to function.  It is the equivalent of functioning

26  expected to be found on standardized testing with scores that are at least

27  three standard deviations below the mean.  20 C.F.R. §416.926a(e)(3).

28

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 5

In September 2002, plaintiff underwent a psychiatric evaluation by Rafat R. Zakhary, M.D., at the Central Washington Comprehensive Mental Health Clinic (CWMHC). At that time, the plaintiff was eight years old and in the second grade. Plaintiff was referred to Dr. Zakhary by his therapist who was concerned he was "having some difficulty with his behavior and inattention in class." (Tr. at p. 215). According to Dr. Zakhary, the "presenting symptoms were that he does not do what he is asked to do, and [his] mother said he is easily distracted and cannot stay on task." (*Id*.). On mental status examination, Dr. Zakhary observed that plaintiff "intruded and interrupted during the discussion, but is easily directable." The doctor added that: "He steals and lies frequently, and is cruel to animals. The baby-sitter was complaining that he was choking the dog. He violates rules and tends to have difficulty respecting and obeying adults." The doctor added, however, that "[c]ognitively, [plaintiff] appears to be grossly intact." (Tr. at p. 216).

Dr. Zakhary's "impression" was that plaintiff had dysthymia; attention deficit hyperactivity disorder, inattentive type: disruptive behavior, not otherwise specified; and diurnal and nocturnal enuresis (bed wetting). The doctor added, however:

> **It was very difficult to scrutinize some of this young child's behavior, how much of it is really due to dysfunctional family and mother not being there.** She said she used drugs up to the last twenty-four months and has very little memory of what has happened while her children have been growing up. The TOVA shows that there is an ADHD score of -5.98, but comments from the observer who gave the test are that [the] patient sat still and was paying attention to the task. Also, a Teacher's Behavior Assessment was done and there were no significant indications of any ADHD.

(Tr. at p. 217).

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT-** 6

1    Dr. Zakhary's conclusion was that it "appeared" the plaintiff had a

2  dysthymic disorder, but also met the criteria for ADHD, inattentive type,

3  "with some disruptive behavior due to lack of structure in the home."  The

4  doctor prescribed Wellbutrin for the plaintiff with the hope it would help

5  with his inattention and his "underlying depression."  (*Id*.).

6    In January 2005, Dr. Zakhary completed a report at the behest of

7  plaintiff's counsel in which he indicated that plaintiff had "marked"

8  limitations in five of the six domains, the only exception being "Moving and

9  Manipulating Objects" in which he indicated there was no limitation.  Dr.

10  Zakhary indicated that these limitations had existed since September 2002

11  when he first saw the plaintiff for evaluation.  (Tr. at pp. 251-52).[2]

12    In September 2003, plaintiff underwent a battery of tests under the

13  direction of Rhonda Palmquist, a licensed school psychologist.  According to

14  Palmquist's "Psychological Report:"

15    Throughout the course of the testing sessions, [plaintiff]
16    was a polite and attentive student to work with.  Specific
     difficulties were noted on those items which taxed his
17    sequential processing abilities.  When challenged, [plaintiff]
     required frequent use of verbal praise and encouragement.
18    [Plaintiff's] responses were made with solid efforts, and
     with appropriate on task skills.  However, due to the broad
19    scatter of intra subtest results, the following standardized
     intelligence full scale results possess compromised
20    validity.

21  (Tr. at p. 237).

22    On his WISC-III,[3] plaintiff was credited with a Verbal IQ of 79, a

23  Performance IQ of 83, resulting in a Full Scale IQ of 79.  This placed

24  _____

    [2]
25  A January 2005 letter from Case Manager Laurel Wetzel of CWMHC to
    the Social Security Administration echoed Dr. Zakhary's assessment.  (Tr.
26  at p. 253).

27  [3]  Wechsler Intelligence Scale for Children-Third Edition

28  **ORDER GRANTING DEFENDANT'S
    MOTION FOR SUMMARY JUDGMENT-** 7

plaintiff in the "low average" range in comparison to other children in his age group. As indicated above, this was considered to be "a conservative estimate" of the plaintiff's "true intellectual range of current cognitive functioning." (Tr. at p. 237).

In November of 2003, Palmquist prepared an "Evaluation Report" regarding the plaintiff which involved "a routine 3 year re-assessment in the areas of current cognitive functioning, and present levels of performance in the core academic areas." (Tr. at p. 240). Palmquist made some observations of the plaintiff in his classroom using the C-BOF, "a classroom peer-referenced time sampling method which allows us to compare [plaintiff's] school behaviors in the areas of Off Task, Out of Place, Inappropriate Physical, Inappropriate Noise Making, and Compliance to the Teacher's Directives." According to Palmquist, there were no "significant behavioral concerns" observed by her. Plaintiff's "adaptive behavior" ("independent, self-care skills") was observed to be age appropriate; assessment data did not reveal overt indications of a serious emotional disorder; and speech and basic language functions appeared to be age appropriate. (Tr. at p. 241). Palmquist noted that plaintiff's mother expressed concern regarding plaintiff's destruction of property at the family home, but that "[a]t this time, [plaintiff's] overall behavioral functioning appears to be age appropriate within the school and classroom setting." (Tr. at p. 243).

In November of 2004, plaintiff was seen at the Cardiology Clinic by Gregory Stevenson, M.D., for followup on his coarctation repair. Dr. Stevenson noted that another area of concern regarding the plaintiff was behavioral and that the plaintiff was on medication which "has been met with good attention span and prompt response to commands and questions." The

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT-** 8

doctor observed that ""[h]is behavior during the clinic visit today was absolutely normal, normal interaction, and good behavior." (Tr. at p. 255).

Based on his review of mental health record, in particular the reports from CWMHC, Dr. McKnight testified at the administrative hearing that he was "impressed with the just absolute lack of consistency in terms of responses to the [plaintiff's] behavior and the complaining that all this is the child's issue rather than issues with the environment." (Tr. at p. 329). Dr. McKnight opined that the testing which had taken place was inadequate and that new testing was necessary to assess plaintiff's cognitive functioning. The doctor also recommended that plaintiff's current school teachers be consulted regarding plaintiff's performance in class. (Tr. at pp. 329-30). Dr. McKnight said he could not determine if Dr. Zakhary was board certified in any specialty. He added that it was rare that a child would not respond to medication for ADHD and that when children do not respond, "we start looking environmentally to see what the problem is." (Tr. at p. 331).

Based on Dr. McKnight's testimony, the ALJ ordered that plaintiff undergo a psychological evaluation by Jay M. Toews, Ed.D. This evaluation occurred in July 2005. Dr. Toews administered the WISC-III to the plaintiff with the following results: Estimated Full Scale IQ of 94; Verbal IQ of 97; and Performance IQ of 93. The doctor noted that these scores "reflect[ed] significant gains from prior testing" and that "[t]he gains are in excess of what would be expected from practice effects." (Tr. at p. 185). Based on these scores, Dr. Toews concluded plaintiff was currently functioning in the average range of intelligence with there having been significant cognitive gains and no indication of a cognitive delay. (Tr. at p. 186).

Dr. Toews also administered the Test of Memory and Learning (TOMAL) to the plaintiff. The testing revealed no indication of any

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT-** 9

cognitive, attention, or memory deficit. (Tr. at p. 186). According to the doctor:

> Overall, it was remarkable that [plaintiff] responded so enthusiastically to memory testing after approximately 90 minutes of intelligence testing. He seemed to respond as if memory testing was like a game. He was intense, focused and competitive. Scores are well above average. There was a hint of impulsivity, more characteristic of a bright child who likes to process things fast than like an individual with a neurologically based neuro-behavioral deficit.

(Tr. at p. 187).

Furthermore, according to Dr. Toews:

> Mrs. Wilmoth stated she has withdrawn [plaintiff] from Yakima schools and enrolled him in another school district because she did not like the limited special education he was receiving in Yakima schools. Dr. Zakhary had indicated (Yakima) teacher reports were not congruent with ADHD. Yakima teacher questionnaire ratings were at variance with mother's complaints about school related behavior. Dr. Zakhary raised questions about the quality of parenting and the stability of the home environment. These issues are significant for stable childhood development and school achievement. These issues suggest situational stressors that could generalize to the school setting and affect learning. Another issue is whether mother has a vested interested in having the child diagnosed with problems. The possibility of iatrogenic psychological and learning problems should be fully evaluated.[4]

(Tr. at p. 187).

Dr. Toews found no indication of an affective disorder, attentional

---

[4] An "iatrogenic" ailment is one that is induced by a physician. Dr. Toews noted that plaintiff's mother repeatedly emphasized that plaintiff was on medication for ADHD. (Tr. at p. 182). During plaintiff's initial assessment with CWMHC in June 2002, the therapist did not notice anything abnormal about plaintiff's behavior, although she did notice that the behavior of plaintiff's mother was "very restless, with rapid and pressured speech." The therapist noted that plaintiff's mother would not allow the plaintiff to finish his sentences whenever the plaintiff wanted to interject. (Tr. at p. 283). The therapist indicated that the mother's presentation suggested a closer look at ADHD with regard to her care. (Tr. at p. 284).

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-** 10

1  disorder, hyperactivity, or behavioral disorder and surmised that any

2  problems plaintiff exhibits "may be specific reactions to the home

3  environment." (Tr. at p. 188). The doctor indicated that plaintiff had no

4  limitations in five of the six domains, and that there was a "less than

5  marked" limitation in the "Caring For Yourself" domain that was due to

6  enuresis. (Tr. at p. 189).

7      Plaintiff's 4th grade teachers noted improvement in plaintiff's school

8  performance which they attributed to his medication for ADHD.

9  In an April 25, 2005 letter, plaintiff's current special education teacher

10 indicated that when plaintiff is on his medication, he is able to focus during

11 group instruction, waits to be called on, and get his work done with nearly

12 complete accuracy. (Tr. at p. 170). In a letter dated May 6, 2005, the

13 plaintiff's current regular classroom teacher, Claudia McBride, noted:

> [Plaintiff] is a very different child now than he was in September [2004]. He has learned how to interact appropriately with his peers in class and on the playground. He is able to attend more fully and stay focused during lessons. He is learning more and retaining what he learns. He no longer exhibits disruptive behaviors during class. [Plaintiff] is not as easily frustrated and applies more effort to his work. The quality of [plaintiff's] work is also improving dramatically. At the beginning of the year [plaintiff] came to fourth grade only printing; now he uses legible, appropriately sized cursive for most of his assignments.

(Tr. at p. 169). Ms. McBride noted there had been a change in the plaintiff's

medication and that beginning in 2005, plaintiff was finally able to calm

down, focus, and apply his developing skills. (Tr. at pp. 168-69).[5]

---

[5] In December 2004 and again in March 2005, Dr. Zakhary noted plaintiff's mother was reporting improvement in her son's behavior. (Tr. at pp. 298 and 300). During the 2005 administrative hearing, plaintiff's mother testified there was no problem with the plaintiff interacting with pets in an appropriate fashion, although that had been reported as a problem to Dr.

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 11**

1     Interestingly, however, in a letter dated May 25, 2006, the same date

2  as plaintiff's administrative hearing and just two weeks after her May 6

3  letter, Ms. McBride reported that plaintiff was no longer focused on learning

4  and once again, was not completing his homework.  According to Ms.

5  McBride, "[e]arlier this year, [plaintiff] appeared to be doing better, but now

6  it seems that we are almost back to where we began in the fall."  (Tr. at p.

7  196).  In a "Teacher Questionnaire" which she completed in June 2005, Ms.

8  McBride indicated that plaintiff had "serious" to "very serious" problems in

9  "Acquiring And Using Information" and in "Attending And Completing

10  Tasks."  (Tr. at pp. 173-74).  She added that plaintiff's ability to focus, pay

11  attention, and work decreased dramatically when plaintiff is not taking his

12  medication.  (Tr. at p. 178).[6]

13     Substantial evidence in the record supports the ALJ's determination

14  that plaintiff does not have a "marked" limitation in two domains, or an

15  "extreme" limitation in one domain, and therefore, his impairments are not of

16  listing-level severity.  These limitations must arise from medically

17  determinable impairments and based on Dr. Toews' report, there is a

18  legitimate issue whether the plaintiff even suffers from ADHD and

19  dysthymia, as opposed to environmental factors being responsible for his

20  behavioral problems, whether at home or school.  Even Dr. Zakhary was

21  equivocal about his diagnoses of ADHD and dysthymia and noted the

22  potential significant impact of environmental factors.  To the extent plaintiff

23

24  ————————————

Zakhary in September 2002.  (Tr. at p. 334).

25

[6]

26  The "Teacher Questionnaire" completed by plaintiff's 3rd grade teachers in

27  November 2003 indicated plaintiff had neither a "serious" or "very serious"
problem in any of the domains.  (Tr. at pp. 145-53).

28  **ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-** 12

suffers from ADHD and dysthymia and it is "severe," substantial evidence supports the ALJ's finding that they are not of listing-level severity (do not cause any "marked" or "extreme" limitations), particularly when the plaintiff takes his medication.  Substantial evidence supports the ALJ's finding that the symptoms of plaintiff's ADHD and dysthymia are controlled by medication and to the extent there is an occasional exacerbation of symptoms (i.e., disruptive behavior), substantial evidence supports the conclusion that non-medical factors are responsible.

## CONCLUSION

Plaintiff's motion for summary judgment (Ct. Rec. 19) is **DENIED** and defendant's motion for summary judgment (Ct. Rec. 22) is **GRANTED**. Pursuant to 42 U.S.C. §405(g), the Commissioner's decision denying benefits is **AFFIRMED**.

**IT IS SO ORDERED.**  The District Executive shall enter judgment accordingly and shall forward copies of the judgment and this order to counsel.

**DATED** this __28th__ of March, 2007.


                              s/ Lonny R. Suko for and on behalf of
                              ALAN A. McDONALD
                              Senior United States District Judge

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 13